## Richmond

T. T. Thomas and The People's Building and Loan Association of Hampton, Virginia v. Undine Davis Young, Thomas Davis, and Undine D. Bassette.

April 25, 1955.

Record No. 4362.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Whittle, JJ.

The opinion states the case.

*William Davis Butts*, for the appellants.

*W. Hale Thompson*, for the appellees.

WHITTLE, J., delivered the opinion of the court.

The question presented on this appeal is whether or not when land is forfeited or sold to the Commonwealth for the nonpayment of taxes such forfeiture or sale constitutes a break in the continuity of possession required to be established by an adverse claimant.

Eliminating non-essential parts of the record, it appears that Undine Davis Young, Thomas Davis, and Undine D. Bassette, appellees, hereinafter sometimes called the Davises, filed a bill against T. T. Thomas and The People's Building and Loan Association of Hampton, Virginia, appellants, hereinafter sometimes called Thomas. The bill alleged that the Davises were the lawful owners of Lot 66, known as 313 Harrison Street, in the City of Hampton; that Undine Davis Young and Thomas Davis were the only children of Thomas Davis, Sr., deceased, and that Mrs. Undine D. Bassette, their mother, was his widow; that in 1908 Thomas Davis Sr. entered upon and "took actual, adverse, notorious, continuous, hostile and exclusive possession and control" of Lot 66 under claim of right, and built a house thereon in 1910; that he exercised exclusive control over the property until his death in 1929, after which time the property came under the control of appellees and has so remained; that Thomas Davis, Sr., in his lifetime held adverse possession of the property for more than the statutory period of 15 years and that appellees, as his heirs at law, have held such possession since his death for more than the statutory period, a combined total of more than forty years. The bill prayed that the title of appellees, the Davises, be "quieted and established", and that their rights in the property be adjudicated.

Appellants, Thomas and the Loan Association, filed an answer to the bill denying the adverse possession as claimed. The answer asserted that Thomas, while not certain from the bill whether the Davises were claiming title individually or as heirs at law of Thomas Davis, Sr., "will defend the suit denying that either Thomas Davis or the plaintiffs * * * have during any continuous period of fifteen years acquired title to Lot 66 under the laws of the Commonwealth".

The evidence on the issue made by the bill and answer was heard by the court *ore tenus*, the case having been agreeably submitted to the Judge for decision without the intervention of a jury.

Mrs. Undine D. Bassette, widow of Thomas Davis, Sr., testified and proved all material allegations in the bill regarding the adverse possession of the lot. On cross examination she was questioned relative to the forfeitures and sales of the lot to the Commonwealth for the non-payment of taxes. She testified that she knew nothing about such forfeitures or sales. Whereupon the land books were introduced by Thomas and the entries thereon relating to Lot 66 read into the record. The entries showed that Lot 66 had appeared on the land books in the name of T. T. Thomas and his predecessors in title since 1908; that said lot was forfeited to the Commonwealth for the non-payment of taxes for the year 1908 and was not redeemed; forfeited for the year 1910 and redeemed January 24, 1922; was delinquent for the year 1934, sold 1936, and redeemed 1939; delinquent for the year 1935, sold 1937, redeemed 1939; delinquent for the year 1936, sold 1938, redeemed 1938, and delinquent for the year 1944, sold 1946, redeemed 1950. In each instance the lot was redeemed by Thomas or his predecessors in title.

Thomas next introduced the commissioner of the revenue of the City of Hampton who testified that his books showed that Lot 66 was assessed in the name of T. T. Thomas and his predecessors in title; that it had never been assessed in the name of any of the Davises. He further in-

troduced the treasurer of the City of Hampton who testified that the taxes paid on the lot were paid by Thomas and his predecessors in title or someone for them; that no taxes were paid on this lot by the Davises although they had paid taxes on other lots owned by them in that vicinity.

The court entered an order holding that such prior forfeitures as shown did not constitute a break in the continuity of adverse possession, and adjudged that the Davises were entitled to the relief prayed for.

From this order we granted Thomas an appeal.

While several assignments of error are listed by Thomas, it was conceded in argument at bar that the assignments presented two major questions for our consideration, viz:

(1) Whether or not land can be forfeited to the Commonwealth for the non-payment of taxes since the passage of the Segregation Act (Chapter 576, Acts of 1926), and

(2) Whether or not, if land is forfeited or sold to the Commonwealth for the non-payment of taxes, such forfeiture or sale constitutes a break in the continuity of adverse possession.

It is argued by the Davises that the law providing for the forfeiture or sale of land to the Commonwealth did not break the continuity of adverse possession required prior to the passage of the Segregation Act (Chapter 576, Acts of Assembly, 1926), and that the passage of this act clarifies any doubt which theretofore might have existed in regard to the legislative intent concerning the forfeiture of land to the Commonwealth for the non-payment of taxes, contending that the Segregation Act, as codified under Title 58 of the Code of 1950, makes clear the intent of the legislature to create an indefeasible lien for taxes on real estate in Virginia, rather than to secure title to the land in the State, which would cause it to become "untaxable".

Thomas, on the other hand, insists that the Segregation Act, as the name implies, was passed for the sole purpose of segregating taxes between the Commonwealth and its various political subdivisions, and that it in no way changed the law

regarding the forfeiture or sale of land to the Commonwealth for the nonpayment of taxes. He insists that both before and after the passage of the Segregation Act a forfeiture or sale to the Commonwealth broke the required continuity of possession.

As to the first question, we conclude that the passage of the Segregation Act effected no change in the law which is material on the point here at issue. Prior to its passage, the State had an interest in the taxes jointly with the county, city and town. This interest the act eliminated, leaving the law otherwise relatively unchanged. The applicable statutes dealing with delinquent lands prior to its passage were carried into the Segregation Act, the changes made being largely those necessary to provide for the contemplated segregation of taxes. For example, § 2490, Code of 1919, which was taken from an earlier statute, provided that the real estate mentioned should "stand *vested* in the said auditor for the benefit of the State *and* county, city *and* town". (Italics supplied) This section was carried into the 1950 Code as § 58-1072, and now provides: "All the real estate mentioned in the lists * * * shall, without any deed for the purpose, stand *vested* in the Commonwealth of Virginia *for the benefit of the county, city or town.*" (Italics supplied). Changes in other prior statutes are of similarly limited purport.

██ This conclusion narrows the issue to question (2) above, *i.e.*, Whether or not, if land is forfeited or sold to the Commonwealth for the non-payment of taxes, such forfeitures or sale constitutes a break in the required continuity of adverse possession.

This question must be answered in the negative as becomes apparent when one appreciates the true meaning of the term "forfeited" as used in our law.

It is clear from a reading of the applicable sections of Title 58, Code of 1950, and from a study of the early Acts of Assembly from which these sections were brought into Title 58, that the prime object of the legislature was and

is to reserve a lien on real estate for taxes and levies assessed thereon; for the benefit of the Commonwealth and the counties, cities and towns prior to the passage of the Segregation Act, and only for the benefit of the counties, cities and towns after the passage of the act.

Section 58-762 reads in part: "There shall be a lien on real estate for the payment of taxes and levies assessed thereon prior to any other lien or encumbrance thereon. The lien shall continue to be such prior lien until actual payment shall have been made * * *." This section further provides that the lien shall "in addition to existing remedies" be enforceable "for the collection of taxes and levies" by suit in equity. And in such suit, § 58-1104 provides "* * * the fact that the real estate was purchased in the name of the Commonwealth at a treasurer's tax sale *shall be regarded merely as security for the taxes and levies in addition to the security already existing by reason of the tax lien or liens. * * *"* (Italics supplied) Neither §§ 58-762, 58-1104, nor 58-1072 indicates that their purpose is other than to guarantee the collection of taxes.

Minor on Real Property (1928), Vol. 2, 2nd Ed., (Ribble), § 1261, page 1704, states:

"At first, the policy of Virginia was to forfeit the delinquent land *absolutely* to the Commonwealth (Citing *Flanagan* v. *Grimmet*, 10 Gratt. (51 Va.) 421, 427; *Smith* v. *Chapman*, 10 Gratt. (51 Va.) 445, 463), upon the theory that the owner holds his land of the State, upon condition that he will furnish a list of his taxable property when required by law and promptly pay his share of the taxes ratably assessed thereon; failing in which, the paramount authority of the State forfeits the land for the breach of the condition. (Citing *Martin* v. *Snowden*, 18 Gratt. (59 Va.) 100, 133). * * * But the policy of Virginia has long been altered. Her laws no longer declare delinquent lands forfeited, but merely provide that there shall be a lien for State taxes and for county or city levies assessed thereon; which lien, however, is to be paramount to every other

charge on the land, whether by mortgage, judgment, * * * or otherwise, though the latter be prior in point of time." (Italics supplied) (Citing *Simmons* v. *Lyle*, [1880] 32 Gratt. (73 Va.) 752; *Thomas* v. *Jones*, [1897] 94 Va. 756, 27 S. E. 813.)

The case of *Armstrong* v. *Morrill*, 14 Wall (U. S.) 120, 20 L. ed. 765 is frequently cited as authority for the proposition that a sale or forfeiture to the state breaks the required continuity in adverse possession. The *Armstrong* case was interpreting an early Virginia statute (Acts 1834-35, p. 11) which effectively divested the title to land from a defaulting title holder and effectively vested same in the Commonwealth. Since the decision in the *Armstrong* case, the related changes in the Virginia statutes make this case and the Virginia cases cited therein no longer applicable.

The early history of legislation sanctioning the forfeiture of land to the Commonwealth for the non-payment of taxes is instructive. Much of the history of such legislation is contained in the earlier Virginia reports. See *Wild's Lessee* v. *Serpell*, 10 Gratt. (51 Va.) 405; *Flanagan* v. *Grimmet*, *supra*. The statements contained in the opinions in these cases and others show that the Commonwealth of Virginia had no need for land but on the other hand rather desperately needed the taxes from the land with which to run the government. Many citizens had acquired by patent from the Commonwealth more land than they could economically use, and, finding it impossible to pay the taxes levied against the land, inevitably defaulted. In order to maintain the government it was necessary for these delinquent lands to be repossessed by the Commonwealth and placed in the hands of those who could profitably use them and pay the necessary taxes.

After the State had reacquired title to the lands, section 28 (Vol. 2) Revised Code of 1819 directed the sheriff on behalf of the Commonwealth to execute a deed to the purchaser of such delinquent lands, requiring him to recite the

circumstances thereof "setting forth particularly and truly, the amount of the purchase money".

Under the law then existing the landowners were required to list their land with the commissioner of the revenue and pay the taxes thereon. Therefore, if land was not listed and thus claimed, it was forfeited to the State, and the title to such unlisted lands being in the State, the statute of limitations would not run.

Under the law as it now exists (§ 58-796, Code of 1950), and as it had existed long prior to the Code of 1919 (§ 2270), it is provided that "each commissioner of the revenue shall commence, annually, on the first day of January, and proceed without delay to ascertain all the real estate in his county or city, as the case may be, and the person to whom the same is chargeable with taxes on that day." Thus the law requiring the landowner to list with the commissioner of the revenue all lands claimed by him on which taxes should be paid was changed and the burden was placed upon the commissioner to ascertain the person to whom such land was chargeable.

Since the passage of this statute (§ 58-796) and since the passage of § 58-762, it has been the purpose of the Commonwealth to create an indefeasible lien on land for taxes due thereon, which lien "shall be * * * prior to any other lien or encumbrance thereon", and "shall continue to be such prior lien until actual payment shall have been made". The sole purpose of the legislation is to protect the Commonwealth by making sure the collection of taxes.

Thus, if land is conveyed in fee simple to another, the conveyance is subject to the Commonwealth's lien for taxes; if there are judgments on the land they are subject to the lien; and if a deed of trust or mortgage is placed upon the land the same is placed thereon subject to the indefeasible tax lien. Nowhere is it indicated that the legislation was passed for any other purpose than detailed above.

The provision of § 58-1072 that says land "shall, without any deed for the purpose, *stand vested* in the Commonwealth

of Virginia for the benefit of the county, city or town", is simply an additional safeguard that the tax lien shall not be defeated by any conveyance from the titleholder to a third person. The section was not intended as a shield, against an adversary claim, for the benefit of a titleholder who has defaulted in the payment of taxes.

In the instant case the Commonwealth is not a party to the proceeding and is in no way affected by the outcome of this private litigation between citizens, one of whom alone would enjoy the benefits intended to be accorded solely to the State or to her political subdivisions; her lien being superior to the rights of either litigant. *Tenn. Coal, Iron & R. Co.* v. *Linn*, 123 Ala. 112, 26 So. 245, 82 Am. St. Rep. 108; *Patten* v. *Scott*, 118 Pa. 115, 12 A. 292, 4 Am. St. Rep. 576; See Anno. 4 Am. St. Rep. 584; 1 Am. Jur., Adverse Possession, § 104, pp. 848, 849.

As stated in 2 C. J. S., Adverse Possession, § 152(e), page 721:

"A so-called forfeiture to the state in those jurisdictions where there is no forfeiture of title in fact and the state never acquires more than a lien for taxes does not interrupt a continuous adverse possession of the land." (Citing *Rupley* v. *Fraser*, 156 N. W. 350, 132 Minn. 311)

"In the absence of legislation providing otherwise, the Statute of Limitations does not run against the government, (Citing *Armstrong* v. *Morrill*, 14 Wall. (U. S.) 120, 20 L. ed. 765), and, therefore, title to public lands cannot be acquired by adverse possession either as against the United States, or as against any of the several states, in some of which there are constitutional and statutory provisions to this effect. This rule, however, has no application in litigation where the state is only a nominal party, its name being used merely for the enforcement of the rights of third persons who alone will enjoy the benefits." I Am. Jur., Adverse Possession, § 104, pp. 848, 849.

It was stated in *Martin* v. *Snowden*, *supra* (18 Gratt. (59 Va.) 100):

"The language of the fourth section of the Act of June 7, 1862, does not require the construction contended for. The terms 'forfeited to the United States' do not necessarily import that the title shall be thereby divested out of the owner and vested in the United States. It is a rule of the common law, that where an Act of Parliament declares that a person 'shall forfeit' his lands to the King, or that a person's lands 'shall be forfeited' to the King, the title to the lands is not divested in the King by the mere force of the forfeiture. An inquest office is necessary for that purpose. * * *" (Citing Blackwell's Tax Title, Chapter 32.)

It is argued that *Reusens* v. *Lawson*, 91 Va. 226, 21 S. E. 347, is authority for the position here contended for by Thomas. We do not so interpret the holding in the *Reusens* case. In that case the plaintiff, who was the record titleholder, asked for instruction No. 14 (91 Va., at pp. 229, 230) which would have told the jury that in computing the time of adverse possession they should not only exclude the time between April 17, 1861, and January 1, 1869 (which was the stay period created by the statute growing out of the war between the States, Code, 1887, § 2919, p. 699), but that where lands had been forfeited and sold to the Commonwealth adverse possession prior to and after forfeiture and redemption "though it might in fact have been continuous, cannot be tacked or united", and that the time between forfeiture and redemption could not be counted as part of the period of limitation. The trial court refused to give this instruction but gave instead defendants' instruction No. 8 (91 Va., at p. 230) which stated merely that "in computing the time necessary to mature title by adverse possession, the time between 17 April, 1861, and January 1, 1869" must be excluded. The plaintiff insisted that "it was error in the court to give the defendants' instruction No. 8, and to refuse to give his instruction No. 14" (91 Va., at p. 237). The court held, however, that no error had been committed, saying that the purpose of the instruction was to tell the jury what constituted adversary

possession under color of title "and the length of time it must be so held to ripen into good title". It was further held that the defendants' instruction "stated the law upon that subject clearly and correctly".

This holding that the defendants' instruction was correct necessarily disapproved the plaintiff's instruction on this point, for in the *Reusens* case there had in fact been a forfeiture to the Commonwealth and it was material whether the time should be excluded or whether "tacking" should be allowed. It will be seen by reference to pages 243 and 244 of the opinion that all the court held upon the point whether the possession ceased to be adverse was that the period of forfeiture "would cease to be adversary as against the Commonwealth", the opinion stating that "there can be no adverse holding against the Commonwealth while the title is vested in it".

It is nowhere indicated that possession during forfeiture does not continue to be adverse to the holder of the record title. The holding in the *Reusens* case was directly against the plaintiff who held the record title and was claiming that the outstanding title, by forfeiture to the Commonwealth, did not deprive him of a sufficient operative title on which to base his action of ejectment.

There are cases and authorities which apparently hold to a strict literal construction of the words "vested" in the State or "forfeiture" and "sale" to the State (for non-payment of taxes), thus holding that the statute does not run against the sovereign and therefore such "vesting" in, or "forfeiture" or "sale" to the State breaks the required continuity of adversary possession, such being apparently contrary to the holding here expressed. See *Ward* v. *South Coast Corp.*, 198 La. 433, 3 So. (2d) 689; *Brinsfield* v. *Carter*, 2 Kelly (Ga.) 143; *Ringgold* v. *Malott*, 1 Har. & J. (Md.) 299; *Armstrong* v. *Morrill, supra;* Hutchinson's Land Titles, Va. and W. Va., (1887), § 375, p. 209; 1 M. J., Adverse Possession, § 50, p. 258.

But as heretofore indicated, authority is not lacking in

support of the view that forfeiture to the State for non-payment of taxes does not interrupt the continuity of a claimant's adverse possession, except as against the State. Minor on Real Property, Vol. 2, 2nd Ed., (Ribble), § 1261, *supra;* Anno. 4 Am. Rep. 548, *supra;* 1 Am. Jur., Adverse Possession, § 104, *supra;* 2 C. J. S., Adverse Possession, § 152(e), *supra;* and cases there cited.

We find no cases in Virginia sustaining the position taken by Thomas, although the *Reusens* case is often erroneously cited as such authority. The law in Virginia dealing with land forfeited to the State for the non-payment of taxes is intended, as aforesaid, to create an indefeasible lien in the Commonwealth for the collection of taxes, this being the sole purpose of the legislation.

Thomas is here seeking to bring the Commonwealth into the picture for the purpose of defeating the Davises' adversary holding of Lot 66 for a period of more than forty years. The so-called forfeitures or sales of the lot to the Commonwealth were occasioned by the failure of Thomas or those under whom he claims, to pay the taxes thereon. He should not be permitted to make use of these forfeitures or sales caused by his own default in order to obtain or preserve rights which, admittedly, would have no existence but for his neglect. He should not be permitted to secure an advantage through his own default nor to make use of his own unlawful nonfeasance in order to break the continuity of the Davises' adversary possession. Such is not and should not be the law. The Commonwealth's immunity to the running of the statute of limitations cannot be used as a shield to the advantage of Thomas "who alone will enjoy the benefits". I Am. Jur., Adverse Possession, § 104, *supra.* See also *Va. and W. Va. Coal Co.* v. *Charles,* (1917), 251 F. 83; affirmed 254 F. 379.

For the reasons stated the order of the lower court is

*Affirmed.*